364 So.2d 777 (1978)
JESS PARRISH MEMORIAL HOSPITAL, Petitioner,
v.
FLORIDA PUBLIC EMPLOYEES RELATIONS COMMISSION and Laborers International Union of North America, Local No. 666, Respondents.
No. GG-463.
District Court of Appeal of Florida, First District.
November 6, 1978.
Rehearing Denied December 15, 1978.
*779 Joe D. Matheny of Henderson, Matheny & Jones, Titusville, W. Reynolds Allen and Donald H. Wilson, Jr. of Hogg, Allen, Ryce & Norton, Coral Gables, for petitioner.
Phillip P. Quaschnick and William E. Powers, Jr., Tallahassee, Mark F. Kelly and Richard H. Frank, Tampa, for respondents.
ERVIN, Judge.
Jess Parrish seeks review of a final order of the Public Employees Relations Commission (PERC) dated June 30, 1977. While the appeal was pending before this court, upon motion of PERC, we relinquished jurisdiction to it for 30 days for the entry of an amended order, which was issued December 12, 1977. The original order had adopted all the findings of the recommended order by the hearing officer. The amended order adopted all but one of the recommendations. The one finding was reversed, and PERC ordered the hospital to cease and desist from unlawfully interrogating employees concerning union sentiments and activities, threatening employees with loss of benefits or employment for exercising their rights under PERA, advising employees that they could not join an employee organization, preparing and distributing to its employees documents urging them to withdraw from union membership, and interfering with, restraining or coercing its employees in the exercise of their rights of self-organization. Finally the hospital was ordered to post a notice to employees of compliance with the order. Since the hospital has raised numerous points on review, the facts, as they relate to each point will be discussed infra.
The hospital first argues that the order of PERC is unenforceable since contrary to the requirements of Section 120.59(1)(b), that final orders be rendered in writing within 90 days after a recommended order has been submitted to the agency and parties, PERC's final order was not issued within such time and none of the parties waived the time period as permitted by Section 120.59; consequently, the order is invalid. This point is without merit: G. & B. of Jacksonville, Inc. v. Department of *780 Business Regulation, 362 So.2d 951 (Fla. 1st DCA 1978), held that while the 90 day period in Section 120.59 is mandatory, the effect of its violation will depend upon whether the fairness of the proceedings or the correctness of the action taken was found to be impaired. The hospital makes no argument and the record does not show that there was unfairness or material error as a result of the delay.
Second, the hospital argues that PERC does not have the statutory authority to prosecute unfair labor practice cases. Under the statute as it existed at the time, Section 447.503, Florida Statutes (1975),[1] was silent as to the grant of any specific authority to prosecute unfair labor practice charges following the investigation and filing of a complaint, although Fla. Admin. Code R. 8H-4.08 permits the general counsel of PERC to "assume part or all of the burden of presenting the evidence in support of the allegations in the complaint." The hospital did not assert this as error before the DOAH hearing officer, although at the hearing before PERC, which was simply one in the nature of a review of the proceedings taken before the hearing officer, cf. Pasco County School Bd. v. PERC, 353 So.2d 108 (Fla. 1st DCA 1977), the hospital raised the issue for the first time. PERC concluded that the hospital was questioning the validity of Rule 8H-4.08, supra, and that, according to PERC's Rule 8H-4.12, F.A.C., the issue was waived when not brought to the attention of the hearing officer. We agree with PERC that the issue was waived and that it was not fundamental error which could be reviewed for the first time by PERC. See Pasco County School Bd. v. PERC, supra.
The hospital next argues that administrator Muse's letter to all hospital employees was not violative of Section 447.501(1)(a), Florida Statutes (1975), making it an unfair labor practice for public employers to interfere with, restrain or coerce public employees in the exercise of any of their rights guaranteed by PERA.
The testimony before the hearing examiner revealed that during the summer of 1974, Laborer's International began an organizational drive among the hospital's employees. Later, the union's representative requested Muse to recognize the union as the employees' collective bargaining agent and presented authorization cards to him which it represented were signed by a majority of the employees. Muse refused to recognize the union. Before a certification petition was filed by the employee organization with PERC, as authorized by Section 447.307(2), Muse, on January 27, 1975, sent the following letter to all employees:
TODAY Newspaper 1-27-75
"UNION TURNS SOUR"
"25 to 30 UNION MEMBERS TURN IN RESIGNATIONS"
PRESENT UNION MEMBER  "I'M FOR A UNION, BUT I'M AGAINST A SORRY UNION AND THAT'S THE WAY THIS ONE IS BEING RUN."
As we have stated in other letters to you, your hospital has benefits equal to or better than any other hospital in our area. We have maintained this position for years and will continue to be a leader in the future.
To my knowledge no other hospital in the State of Florida pays their employees a cash bonus for unused sick leave or has a more up-to-date health insurance plan than ours.
I don't know who has signed authorization cards but recently a number of you have requested how you might go about revoking the union card that perhaps you signed due to a lack of understanding from organizers of the Laborers International Union, Local 666. Enclosed in this letter is a card addressed to the PERC Commission in Tallahassee requesting withdrawal of your name. Please be assured no pressure will be brought by this office requesting that you do this. *781 With Union's, its  MONEY IS THE NAME OF THE GAME. It is a well known fact, because of the slow down in the construction trade, the Unions are looking elsewhere for $$$  your $$$. Ask Mr. Tyler what percentage of your monthly dues would stay in Brevard County or does it head south to the union leaders in Miami?
PERC found that while Muse could not name any of the individuals who had questioned him about withdrawing their authorization cards, the evidence supported a finding that some did in fact make such request. It also observed that Muse's letter was sent to all employees and that Muse testified his intention was for all employees to revoke their authorization cards. It noted that while Section 447.501(3) protects employers in expressing their opinions, nevertheless an employer may not by its conduct interfere with employees in the exercise of their organizational rights. Section 447.501(1)(a). It continued that the answer to whether employer action in soliciting withdrawal of previously executed authorization cards is an unfair labor practice depends upon "whether the employer directly or indirectly causes, encourages or facilitates ... such action." PERC adopted the NLRB test for illegal interference in the context of a decertification drive, under which a union must show (1) that the employer encouraged, condoned or ratified the preparation and circulation of a decertification petition and (2) that the employer actively supported, encouraged and cooperated in soliciting the decertification signatures. See Washtenaw County Commissioners, 1972 MERC Lab.Op. 794.
PERC relied primarily upon The Deutsch Company, 165 NLRB 140 (1969), to support its finding that an unfair labor practice occurred. There the employer sent letters to all employees, without any of the employees' prior requests for assistance, advising them how to go about revoking their authorization cards. The Board's finding was affirmed in NLRB v. Deutsch Company Metal Components Division, 445 F.2d 902, 906 (9th Cir.1971), in which the court stated: "The Board's finding ... is completely consistent with the established rule that an employer cannot engage in conduct calculated to erode the employee's support for the union... . The thrust of the company's mailing was to undermine employee support for the union." We believe the facts in Deutsch Company are distinguishable from those here and that PERC employed too strict a test which severely limited the employer's pre-election comments permitted by Section 447.501(3).
NLRB v. Gissel Packing Company, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), sets out standards by which an employer's pre-election speech is to be evaluated in unfair labor practice disputes:
[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization... . If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. 395 U.S. at 618, 89 S.Ct. at 1942 (e.s.)
In Gissel, the Supreme Court upheld a finding that literature distributed by the employer in an election drive was threatening and violative of the NLRA. The NLRB had found the employer's statements, letters and campaign literature conveyed a message that the company was faring badly financially and would close in the face of *782 any strikes resulting from unreasonable union demands. The Court stated the
Board could easily conclude that the intended and understood import of that message was not to predict that unionization would inevitably cause the plant to close but to threaten to throw employees out of work regardless of the economic realities. 395 U.S. at 619, 89 S.Ct. at 1943.
We conclude that the letter sent by administrator Muse was not couched in language violative of the Gissel standards. There was certainly no threat of reprisal or force or promise of benefit if the employees refused to comply with the administrator's assistance in withdrawing their authorization cards. In fact the letter specifically advised them that "no pressure would be brought by this office requesting that you do this." It is clear that the contents of the letter alone were not violative of Section 447.501(1)(a). Compare Laborer's Dist. Council of Georgia v. NLRB, 163 U.S.App. D.C. 308, 501 F.2d 868 (1974).
The next question is whether the employer's action in sending deauthorization cards, stamped and addressed to PERC, under the circumstances, was an unfair labor practice. The Deutsch Company case, while holding that comments in the employer's letter were not prohibited by the NLRA, concluded that the gratuitous, unsolicited offer of assistance by the employer to all employees was an unfair labor practice. The facts here are different in that PERC found some of the employees had made such a request. The circumstances before us are analogous to those in Holly Farms Poultry Industries, Inc., 194 NLRB 952 (1972). There, during an authorization drive, and before the union had asked the employer for recognition, the employer sent a letter explaining the procedure of deauthorization and forwarded with it revocation cards to all employees after receiving inquiries from some employees about revocation. The letter, as the letter here, advised the employees that the choice whether to revoke the cards was strictly their own. The NLRB stated that the letter clearly conveyed to the employees that the choice to withdraw their cards was subject to their own volition; therefore the letter was held non-coercive. Two later opinions of the NLRB held no unfair labor practice occurred when the employees initiated the request to withdraw their authorization cards and the employer assisted in the mechanics of revocation. E.g., Aircraft Hydro-Farming, Inc., 221 NLRB 581 (1975); Jimmy-Richard Company, Inc., 210 NLRB 802 (1974).
Whether Section 447.501(1)(a) is violated by communications from an employer to his employees relating to union membership depends upon the particular circumstances of each case. Both the employer and the employee organization have a constitutional right to freedom of expression in making pre-election comments so long as the comments do not violate the Gissel standards, enacted in Section 447.501(3), which forbids promise of benefits or threat of reprisal or force. If the employer, however, sends letters containing anti-union statements which cumulatively create "an atmosphere in which an employee's free choice is rendered impossible ...", Gilbert International, Inc., 213 NLRB 538 (1974), then the expressions become overbearing and lose First Amendment protections.
Whether an employer commits an unfair labor practice by involving himself in employee revocation of union authorization cards depends upon the degree of employer participation in the process. The determinative factor is whether the idea of revocation is initiated by the employees, or whether the idea originates with the employer. Under the circumstances, we conclude that PERC's finding that administrator Muse committed an unfair labor practice in mailing the letter and deauthorization cards to the employees is not supported by the evidence, and the finding is reversed.
Next the hospital argues that statements[2] attributed to two of its employees *783 and made by them to other employees were not imputable to it since (1), the employees were not its agents, and (2), even if they were, the statements were not authorized by the hospital since it had specifically disclaimed them. PERC's amended order held that the parties' stipulation which stated that employees Shreve and Bullington were officers, agents, representatives and-or supervisors and-or managerial employees who acted on behalf of the hospital could not support a finding that the two employees were managerial employees since such designation could not be stipulated to under Section 447.203(3)(d).[3] PERC found however there was nothing in PERA prohibiting the parties from stipulating that Bullington and Shreve were the hospital's agents. The hospital argues that since Bullington and Shreve were not found to be managerial employees, they were part of the bargaining unit and free to express their views to the employees under them. The hospital relies upon one of PERC's cases, City of Port St. Joe, 3 FPER 179 (1977), where it was held interrogation by a supervisor was not violative of the act because the bargaining unit determination had placed the supervisor within the employees' specific unit. However, that case, as PERC persuasively argues, is not applicable since here no bargaining unit determination had been made when the unfair labor practice complaint was filed. Under the NLRA, an individual can be an agent of the employer without being a supervisor, and acts of the employer's agents, though not specifically ratified by the employer, are chargeable to it for purposes of finding unfair labor practices. See NLRB v. Broyhill Co., 514 F.2d 655, 657 at n. 5 (8th Cir.1975).
The hospital's argument that it disclaimed any agency relationship by sending all supervisory employees a list of items to avoid during the union's authorization drive is without merit. The evidence supports PERC's finding that administrator Muse was aware that the employees were worried that reprisals might follow if they signed the authorization cards, but that despite his knowledge, he took no positive steps to allay their fears. Thus the employer's disclaimer may not overcome a conclusion that an employee is acting on behalf of the employer when the employer allows the employee continuously to interview employees and to make threatening statements to them. NLRB v. Solo Cup Co., 237 F.2d 521, 524 (8th Cir.1956); cf. NLRB v. Mississippi Products, Inc., 213 F.2d 670, 673 (5th Cir.1954).
The hospital's argument that certain of Bullington's statements, found by PERC to be coercive, were only warnings to her supervisory employees and not intended to influence impermissibly those employees is without merit. Our review of the record convinces us that PERC's findings were supported by competent substantial evidence that the statements as made threatened loss of benefits to the employee if the union were elected.
The hospital's argument that PERC should not have been allowed to amend its final order after the petition for review was filed is also without foundation. This court temporarily relinquished jurisdiction to PERC to amend its order upon PERC's motion; therefore, the cases the hospital relies upon, State v. Seaboard Airline Railway Co., 93 Fla. 104, 111 So. 391 (1927); Peoples Gas System, Inc. v. Mason, 187 So.2d 335 (Fla. 1966), are inapplicable.
The hospital next argues that appellate attorney's fees and costs should be assessed against PERC for fees and costs incurred by the hospital in prosecuting the appeal from the original order issued by PERC and later amended on remand, which displaced one of the hearing officer's recommendations. The hospital contends it tried *784 to point out the errors in the recommended order to PERC long before this court remanded PERC's original order for correction.
Section 447.504(4) provides that the district courts of appeal may award appellate attorney's fees and costs to "the prevailing party" after judicial review. PERC answers that it is a quasi-judicial, adjudicatory body, and not a party within the meaning of that section, and if it were held to be a party, it would be subject to attorney's fees and costs in every case in which it rendered an order; further, its judgment would be affected by that knowledge.
We reject PERC's argument that attorney's fees and costs may be assessed only against the non-prevailing party to the proceeding. Section 447.504(4) does not impose the sanction of fees and costs only against the non-prevailing party. PERC, as any other agency, may be answerable for such awards. Section 120.57(1)(b)(9) permits an appellate court, in the event of reversal of an agency order, in its discretion to award fees and costs to the "aggrieved prevailing party."[4] The hospital, however, is hardly the prevailing party, as contemplated by the statute, since only one finding of the hearing examiner was set aside by PERC after the agency had requested remand, as well as two additional findings by us in this opinion. The remaining findings stand undisturbed. The hospital is therefore not entitled fees and costs since it is clearly not the prevailing party.
Having so concluded, however, we think it appropriate to comment upon some general principles which may be of aid to a determination, once an agency order is reversed, whether to impose fees and costs against an agency when it is acting within the scope of its adjudicatory responsibilities. While § 120.57(1)(b)(9) does not at present impose any requirement of bad faith or maliciousness as a condition to an award, we would be reluctant to impose fees and costs against an agency if, for example, its order was reversed only because it had erroneously interpreted a provision of law or the agency's action depended upon a finding of fact which was not supported by competent, substantial evidence in the record. We feel, as to those circumstances, there are appropriate sanctions set forth in 120.68, including setting aside or modifying the agency action or remanding the agency action without imposing the additional sanctions of fees and costs against the agency. We note that the 1974 APA accords to the agency latitude in both discretion and policy. See § 120.68(7), (12)(b) and (c). We have previously recognized the special responsibility an agency has in refining its policy to adjudication in individual cases. McDonald v. Dept. of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977). An agency order which did not describe its "policy within the agency's delegated discretion sufficiently for judicial review," § 120.68(7), would probably require only remand to the agency for further explication. As we stated in McDonald, the failure of an agency to expose its reasons for discretionary action will result in the relief authorized by § 120.68(13), such as an order setting aside agency action, or remanding the case for further proceedings, or, finally, deciding the case itself. It would be difficult to conceive an instance where mere remand to an agency might also occasion the imposition of fees and costs.
Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), is helpful in setting forth certain broad guidelines in answer to the question whether an agency has acted appropriately within the perimeters of the discretion delegated to it. Dalehite is, of course, distinguishable from the present case since it interpreted the discretionary function exception to the statute waiving immunity to the government in federal tort claims. See 28 U.S.C. § 2680. The statute excepts any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function *785 or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." The court interpreted the exception as follows:
The "discretion" protected by the section is not that of the judge  a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law. 346 U.S. at 34, 73 S.Ct. at 967. (e.s.)
The court continued:
[The discretionary functions] also include determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. 346 U.S. at 35-36, 73 S.Ct. at 968.
If, on the other hand, agency decisions do not involve policy judgments in the policy interest, such decisions have not been held immune from judicial review. Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62 (1955); aff'd 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955); Hendry v. United States, 418 F.2d 774 (2d Cir.1969); Griffin v. United States, 500 F.2d 1059 (3d Cir.1974). In the latter case, the distinction between an agency's activities which immunize it from tort claims and those which do not was stated as follows:
Although Congress has provided that activity within the authority of a Government official, if a "discretionary function," may not be the basis of Government liability even if negligent or an abuse of discretion, Congress has not immunized such activity if it exceeds the authority conferred. Liability, in such cases, is predicated not on a negligent or unwise policy determination, but on the failure of Government employees to conform to and act consistently with the authority delegated. We do not hold that the Government may be liable for policy determinations made by its officials. Rather, we hold only that the Government may be liable where its employees, in carrying out their duties, fail to conform to pre-existing statutory and regulatory requirements. Griffin v. United States, supra, at 1069.
The above standards have been implicitly followed by us. We have assessed attorney's fees and costs pursuant to § 120.57(1)(b)(9), Fla. Stat. (1977), against agencies which flagrantly violated the requirements of Chapter 120 by denying § 120.57 hearings and refusing to promulgate procedural rules as mandated by § 120.53. Capeletti Brothers, Inc. v. DOT, No. KK-105 (Fla. 1st DCA, August 9, 1978); Graham Contracting, Inc. v. Dept. of General Services, 363 So.2d 810 (Fla. 1st DCA 1978).
Reasoning from Dalehite, Griffin, Capeletti and Graham Contracting, Inc., we conclude that an agency's actions may more often be subject to the harsher sanctions of fees and costs if either the fairness of the proceedings or the correctness of the action was impaired by material error in procedure or by a failure to follow prescribed procedure. Section 120.68(8). Stated in another way, an agency which does not "conform to and act consistently with the authority delegated" to it, Griffin v. United States, supra, at 1069, may be answerable to a prevailing party in costs and fees. The above principles are of course not all inclusive. As we observed in Carlton v. State Div. of Occupations, etc., 354 So.2d 77, 79 (Fla. 1st DCA 1978): "It is impossible to state with precision a general rule locating the outer perimeters of appropriate agency discretion. This may only be done on a case-by-case basis."
PERC's order as amended is affirmed in part and reversed in part. Its petition for enforcement, as modified, is granted.
MILLS, Acting C.J., and MELVIN, J., concur.
NOTES
[1] Section 447.503 was amended by Ch. 77-343, Laws of Florida, and now authorizes PERC to issue a complaint and cause it to be served upon the person charged with the unfair labor practice.
[2] Two supervisory employees warned other employees that if the union were elected certain employee benefits would be lost and salaries decreased.
[3] The criteria to be considered by PERC under the statute defining managerial employee generally includes whether the employee formulates policy, assists in collective bargaining negotiations, and has a significant role in personal administration. PERC is mandated by the statute to "consider the historical relationship of the employee to the public employer..."
[4] Formerly, the statute, § 120.57(1)(b)(10), Fla. Stat. (Supp. 1974), permitted the reviewing court, in the event an agency's final order was reversed, to assess fees and costs if the agency action was "done in bad faith or maliciously."